UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
SHAQUILLE UPSON,

                    Petitioner,

         - against -

MICHAEL CAPRA, Superintendent,

                    Respondent.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1705 (PKC)

PAMELA K. CHEN, United States District Judge:

Petitioner Shaquille Upson, currently in state custody and proceeding *pro se*, seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  (Pet., Dkt. 2.)  For the reasons below, the Petition is denied.

## BACKGROUND

### I.    Factual Background

On April 20, 2016, Shaquille Upson ("Upson") was convicted, in Supreme Court, Kings County, of one count of Murder in the Second Degree (N.Y. Penal Law § 125.25[1]) and two counts of Criminal Possession of a Weapon in the Second Degree (*id.* §§ 265.03[1][b], [3]) for the fatal shooting of Armel Mallory ("Mallory").  (Dkt. 5-2, at 1, 3.)  He was sentenced to an aggregate term of 22 years to life in prison.  (*Id.* at 1.)  The relevant facts, as adduced at trial, are set forth below.

### A.    Armel Mallory's Arrest

In October of 2012, New York City Police Department ("NYPD") Intelligence Officer Amy Suarez of the 78th Precinct began investigating Mallory, also known as "Barney," due to a community complaint regarding the sale of narcotics occurring in Mallory's Wyckoff Gardens Housing Development apartment at 272 Wyckoff Street in Brooklyn, New York.  (Tr. 394–95,

1

401–02.)   A year later, on October 31, 2013, a warrant was granted and executed to search Mallory's apartment (Tr. 398–400), where NYPD officers found marijuana, drug paraphernalia, crack cocaine, and a pistol (Tr. 408–10).   Mallory was arrested and provided officers with information during his post-arrest debrief that allowed them to obtain and execute a search warrant for Petitioner's apartment, located in the Walt Whitman Housing Development in the 88th Precinct.  (Tr. 410–11, 434–36.)  The officers took Petitioner and two others back to the 78th Precinct, but released Petitioner without charges.  (Tr. 437–38, 441.)  Petitioner, to the officers' knowledge, was not aware that Mallory was the cooperating informant.  (Tr. 440–41.)

### B.   Murder of Armel Mallory

On the evening of April 13, 2014, between 10:30 and 11:00 p.m., D'Andre Bowers ("Bowers"), arrived home at his apartment (Tr. 215–16) located at 79 North Oxford Walk, also known as the Walt Whitman Houses (Tr. 208–09).[1]  Bowers saw Mallory standing outside his apartment building as he came home.  (Tr. 217–219.)  Mallory was Bowers's family friend, and Bowers purchased marijuana from Mallory "everyday or every other day."  (Tr. 210–11.)

After spending approximately an hour in his apartment, Bowers came downstairs to purchase marijuana from Mallory, when he saw Petitioner standing outside.  (Tr. 216–19.)  Bowers and Petitioner were "associates," as they were close in age and had known each other since they were "young," occasionally playing basketball together.  (Tr. 212–14.)  Bowers saw Mallory at a distance and ran to catch up to him.  (Tr. 220.)  Before he reached Mallory, he passed by Petitioner, giving him a "head nod" and they made "[c]lear eye contact[.]"  (*Id*.)  Bowers recalled Petitioner wearing a "multi-color[ed] sweater" at that time.  (*Id.*)

---

[1] Bowers provided this account of the murder during his testimony at Petitioner's trial. (*See* Tr. 206–34 (Bowers's direct examination).)

Bowers then bought marijuana from Mallory and walked past Petitioner a second time. (Tr. 221–22.) As Bowers walked back to his apartment, Petitioner walked past him in the direction of Mallory, and shortly after, Bowers heard a gunshot fired behind him.  (Tr. 221–22, 253–56.) In response, Bowers looked over his shoulder and began running back to the building.  (Tr. 222, 256–58.) As Bowers looked back, he saw Petitioner fire a gun at Mallory.  (Tr. 222–23, 231, 258–60.)  Although Mallory himself was obscured by a gate, Mallory's feet were visible to Bowers. (Tr. 223, 258.)  Furthermore, the area was at least partially illuminated by streetlights and lights under the scaffolding.  (Tr. 72, 86–87, 461.)  In Bowers's recollection, Petitioner and Mallory were standing about a foot apart, and Bowers heard four or five shots before he saw Petitioner running away.  (Tr. 223.)  Bowers then anonymously called the police, informing them that someone had been shot, but did not give any details of what he had witnessed out of fear.  (Tr. 223–24.)

1.   Crime Scene Evidence

In the early morning of April 14, 2014, shortly after midnight, NYPD Detective Joseph Rodriguez and his partner arrived on the scene.  (Tr. 455, 459.)  They found five .9-millimeter shell casings on the ground.  (Tr. 424, 461.)  It was later determined that all five casings were fired from the same gun. (Tr. 424–425, 429.)

2.   Autopsy Results

Mallory died as a result of the shooting.  (Tr. at 341–42.)  An autopsy report identified four gunshot wounds (Tr. 335), the fatal shot being to the back of Mallory's neck, at the base of his skull (Tr. 341–42).  Photographs of Mallory's body showing the four bullet wounds were admitted into evidence and published to the jury.  (Tr. 340–50 (discussing People's Ex. 32).)

3.    Security Footage

Detective Rodriguez was not able to obtain security footage of 79 North Oxford Walk or buildings surrounding it because there were no security cameras located in the area (Tr. 476), but there was CCTV (i.e., closed-circuit tv) unit footage of a nearby building's lobby, 32 Auburn Place, located less than a block from 79 North Oxford Walk.  (Tr. 462–63, 498.)  The footage shows Petitioner entering 32 Auburn "wearing a light gray polo shirt under an unzipped gray and blue sweatshirt, jeans, and sneakers," (Dkt. 5-2, at 9 (description based on Petitioner's appellate counsel's review of People's Ex. 41")) with "big Afroey [sic], puffy" hair.  (Tr. 501–02 (Detective Rodriguez discussing still photographs taken from People's Ex. 41).)  A short time after, Petitioner is seen from behind, leaving the building with three other men, wearing "a dark blue sweatshirt, jeans, sneakers, and an Afro[.]"  (Dkt. 5-2, at 9; *see also* Tr. 473 (Detective Rodriguez explaining that footage from 32 Auburn Place shows Petitioner walking into the building with one sweatshirt and exiting in another).)

4.    Shannon Willis's Testimony

A little over a week after Mallory's murder, on April 24, 2014, Shannon Willis was arrested and brought to the NYPD's 88th Precinct in connection with a home invasion burglary.  (Tr.  301–02, 313–14, 484–85, 555.)  At the time, officers in the 88th Precinct were asking "anyone who was arrested" about Mallory's murder.  (Tr. 483.)  Willis knew Petitioner through Willis's best friend, Hakeem Johnson ("Johnson"), a high-ranking Crips member who lived at 32 Auburn Place.  (Tr. 298–99, 311.)  Willis also had "heard of [Mallory]" but did not know him well.  (Tr. 298.)  During Willis's post-arrest debrief, he gave an oral statement and sworn audiotaped statement attesting that Petitioner was one of Johnson's Crips "soldiers."  (Tr. 310–11.)  Willis further stated that (i) he had heard Johnson question Petitioner regarding when he would "do something about" Mallory; (ii) he had heard Petitioner indicate that he would kill Mallory; and (iii) he saw Petitioner shoot

4

Mallory. (Tr. 300, 302, 304, 310.) When Willis was called to testify at Petitioner's trial, he reversed course, claiming that he had only heard about the murder after it occurred and that all of his prior statements to the police were fabricated in the hopes of "cut[ting] a deal" for his own burglary arrest. (Tr. 310 (Willis testifying that "[he] lied" during his post-arrest debrief on April 24, 2014); 314 (Petitioner's attorney: "And you stated earlier that you made [your post-arrest] statement because you were hoping to cut a deal on this felony?" Willis: "Absolutely.").) The prosecution attempted to impeach Willis with his prior statements at trial, but he maintained on the stand that his prior statements were fabricated despite knowing that he could be charged for perjury. (Tr. 300–17.)

     5.    <u>Bowers Comes Forward</u>

Around three days after the murder, Bowers contacted NYPD Detective Wendell Stratford[2] and asked to meet because he had information about the incident. (Tr. 467.) Detective Stratford then informed Detective Rodriguez that Bowers was a potential witness to the crime. (Tr. 466–67, 487–88.) However, Detective Rodriguez could not find Bowers immediately after learning he was a witness. (Tr. 487.) Five weeks after the murder, on May 7, 2014, Bowers contacted the NYPD directly. (Tr. 487–88.) Bowers arrived at the police station that evening with his father, a retired corrections officer (Tr. 224–25, 265–66), to whom he had confided about witnessing the shooting (Tr. 224–25). Bowers told police about the events he had witnessed on the night of Mallory's murder. (Tr. 225.) A warrant was then obtained for Petitioner's arrest. (Tr. 467–68.) During the statement Bowers provided to the police, he noted that Petitioner was wearing a multi-colored sweatshirt on the night of the incident. (Tr. 262.) Bowers did not know about the $10,000

---

[2] *See* Tr. 642 (Detective Stratford's first name).

reward offered for information leading to an arrest for Mallory's murderer and was not informed of said reward.  (Tr. 267.)

### 6. Petitioner's Social Media Posts

In addition to speaking with Willis and Bowers, the detectives also located Petitioner's Facebook page.  Detective Rodriguez was aware of a Facebook page for one of Petitioner's friends, "Leekey" (Tr. 468–69), and found a public Facebook page belonging to "Shacc_Upson" by looking at Leekey's "friends" list (Tr. 469, 471.)  This account contained photos of Petitioner at the Walt Whitman Houses. (Tr. 563–64.)  Entries recorded on Shacc Upson's Facebook cited that "Shacc Upson" resided in Fort Greene and attended George Westinghouse High School, which are both true of Petitioner. (Tr. 535, 588.)  The page also had a picture in which Petitioner was wearing a sweatshirt "very similar to the one" seen in the footage of Petitioner entering 32 Auburn Place, on the night of Mallory's murder. (Tr. 471–73.)  Posts were found from November 4, 2013, only four days after Petitioner's apartment had been searched, stating "niggers is rats and some . . . need head shots" and "some niggers need two and I beat it." (Tr. 470, 472, 537.)  As the detectives searched Shacc Upson's Facebook account, an Instagram account by the username "np_shacc" was uncovered. (Tr. 577.)  This account contained the same photo of Petitioner in the "multi-colored" sweatshirt, among other photographs. (Tr. 577–80 (discussing People's Ex. 45).)

### 7. Arrest and Line-up

At approximately 1:00 a.m. on June 15, 2014, NYPD Officer Nicholas Kowatch and his partner noticed three men walking past them, one of whom was identified by Kowatch and his partner as resembling Petitioner, who was pictured on a wanted poster in their car. (Tr. 279–82.)  After Kowatch called the NYPD 88th Precinct Detective Squad and confirmed that Petitioner had an outstanding warrant for his arrest, the officers followed the men and intercepted them.  (Tr.

285–86.)  After Petitioner was apprehended and handcuffed, Petitioner provided the false name of "Deshawn Edwards" to law enforcement.  (Tr. 287.)

On June 15, 2014, a line-up identification procedure was conducted, and Bowers identified Petitioner as the person who had shot Mallory.  (Tr. 225–226.)

### 8.   Rikers Island Phone Call

On June 17, 2014, Petitioner made a recorded phone call to a friend while imprisoned at Rikers Island.  (*See* Tr. 376–78 (admitting People's Ex. 36, the recording of Petitioner's call, into evidence); Dkt. 5-2, at 15 (citing People's Ex. 36).)  On the recording, Petitioner questioned if there were cameras on 79 North Oxford Walk, and his friend responded "you ain't on no fucking cameras because you ain't do that shit!"  (Dkt. 5-2, at 15 (quoting People's Ex. 36).)  Petitioner then made the following statements: "I know someone called the jig on me.  Cause I went in my building . . . [and] I see two cops out on the side of the building."  (Dkt. 5-3, at 17 (quoting People's Ex. 36); Tr. 637.)  In addition, Petitioner stated in the call that he attempted to evade the police by walking in the opposite direction.  (Dkt. 5-3, at 17.)  Petitioner also admitted that after the police caught him, he tried "to tell them a different name . . . but they were like nah we was looking for you for two months."  (*Id.* (quoting People's Ex. 36).)

## II.   Procedural Background

### A.   Petitioner's Conviction and Sentencing in State Court

Petitioner was convicted after a jury trial on April 20, 2016, of one count of murder in the second degree (N.Y. Penal Law § 125.25[1]), and two counts of criminal possession of a weapon in the second degree (*id.* §§ 265.03[1][b], [3]).  (Dkt. 5-2, at 1.)  The state court sentenced him to an aggregate term of 22 years to life in prison.  (*Id.*)  Petitioner is currently in custody at Sing Sing Correctional Facility pursuant to that sentence.  (Dkt. 1, at 1.)

### B.      Petitioner's Direct Appeal

Notice of appeal was timely filed, and on January 17, 2017, the Appellate Division of the New York State Supreme Court, Second Department granted Petitioner leave to appeal *in forma pauperis* and assigned him appellate counsel.  (*Id.*)  Petitioner's state court appeal raised four claims: (1) that Petitioner's social media posts were admitted without proper authentication; (2) that Petitioner was deprived of a fair trial when the prosecutor was permitted to impeach its own witness, Willis; (3) that the prosecutor committed "pervasive misconduct," including "vouching" for Bowers and showing the jury "16 graphic photographs of [Mallory's] body"; and (4) that Petitioner's sentence should be reduced.  (Dkt. 5-2, at 2.)  Petitioner's appeal was denied and the Appellate Division unanimously affirmed Petitioner's conviction on September 2, 2020.  (Dkt. 5, ¶ 15 (citing *People v. Upson*, 127 N.Y.S.3d 884 (N.Y. App. Div. Sept. 2, 2020) ("*Upson I*")).)

In the Appellate Division's affirmation of the judgment, the court adjudicated all four of Petitioner's claims on the merits.  As to the first claim, the Appellate Division found that although the Supreme Court did not properly authenticate Petitioner's social media evidence before admission, it "was harmless as the evidence of [Petitioner's] guilt was overwhelming[.]"  *Upson I*, 127 N.Y.S.3d at 885.  Regarding the second claim, the court also found that Petitioner's claim about Willis's impeachment was unpreserved for review, but "[i]n any event, any error was harmless[.]"  *Id.*  As for the third claim, the appeals court found Petitioner's prosecutorial misconduct claims to be "partially unpreserved," but nevertheless ruled that the prosecutor had not made improper comments and that the photos of Mallory's body at the crime scene were "properly admitted" because "the manner of death and intent were material issues in the case[.]"  *Id.*  Lastly, as to the fourth claim, the Appellate Division found that "[t]he sentence imposed was not excessive[.]"  *Id.*

Petitioner timely requested to appeal to the New York Court of Appeals.  (Dkt. 5, ¶ 16.) Petitioner's request was denied on January 28, 2021.  *People v. Upson*, 164 N.E.3d 958 (N.Y. Jan. 28, 2021) ("*Upson II*").

### C.   Petitioner's Instant Federal Habeas Petition

Petitioner, moving *pro se*, timely filed the instant Petition on March 16, 2022, and raises the same four claims (and the same brief) that he put forth in his state court appeal.  (*Compare* Dkt. 2 *with* Dkt. 5-2.)  Respondent filed an opposition on May 16, 2022.  (Dkt. 5.)  Petitioner did not file a reply, despite being given the opportunity to do so.  (*See* 3/29/2023 Docket Order.)

### STANDARD OF REVIEW

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court can only review a habeas petition after the petitioner "'has exhausted the remedies available in the courts of the State' or such process is unavailable or ineffective."  *Daum v. Eckert*, No. 17-CV-239 (DC), 2023 WL 1451934, at *4 (E.D.N.Y. Feb. 1, 2023) (citing 28 U.S.C. § 2254(b)(1)(A)), *appeal docketed*, No. 23-272 (2d Cir. Mar. 1, 2023); *see also Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) ("[A] state prisoner is required to exhaust all of his available state remedies before a federal court can consider his habeas application.").

After a petitioner's claim is "adjudicated on the merits in State court proceedings[,]" a federal court can only grant a habeas petition with regard to that claim if the adjudication is either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see McCray v. Capra*, 45 F.4th 634, 640 (2022) (same).  "A state court's decision is contrary to clearly established federal law when it 'applies a rule that contradicts the governing

law set forth in [Supreme Court case law] or . . . confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *McCray*, 45 F.4th at 640 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under this standard, a federal court may not issue a writ of habeas corpus simply because it thinks the state court applied clearly established federal law erroneously or incorrectly . . . . Instead, relief is warranted under section 2254 only where there is no possibility fair[-]minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* (citations and quotation marks omitted); *Totesau v. Lee*, No. 19-CV-6992 (PKC), 2022 WL 1666895, at *12 (E.D.N.Y. May 25, 2022) ("These standards are difficult to meet, because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." (citations and quotation marks omitted)).

Finally, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (citation omitted). That is, federal courts may not review a state court ruling that "'fairly appear[s] to rest primarily on state procedural law,'" so long as the procedural bar is "'adequate to support the judgment.'" *Murden v. Artuz*, 497 F.3d 178, 191–92 (2d Cir. 2007) (citations omitted). This Circuit has consistently held that New York State's "contemporaneous objection rule" allowing "state appellate courts [to] review only those errors of law that are presented contemporaneously such that the trial court is 'reasonably prompted' to correct them—'is a firmly established and regularly followed New York procedural rule.'" *Guerrero v. Lamanna*, No. 18-CV-6774 (DC), 2023 WL 1070459, at *4 (E.D.N.Y. Jan. 27, 2023) (quoting *Downs v. Lape*, 657 F.3d 97, 103, 104

(2d Cir. 2011)).  Thus, federal habeas relief should be denied when "the Appellate Division[] rul[ed] that the failure of a petitioner to object at trial rendered a claim unpreserved for [state court] appellate review."  *Id.*; *see also Garcia v. Lewis*, 188 F.3d 71, 81–82 (2d Cir. 1999) (affirming denial of habeas relief where petitioner's trial counsel failed to raise a claim at trial which he later attempted to assert on appeal).

## DISCUSSION

Petitioner raises four claims in the instant federal habeas petition and has exhausted his state court remedies for each claim.  *See* 28 U.S.C. § 2254(b)(1)(A).  Specifically, he included all four claims in his direct appeal to the Appellate Division and his application for leave to appeal to the Court of Appeals.  (*See* Dkts. 5-2, 5-4.)  The Appellate Division denied all four claims on the merits, *see Upson I*, 127 N.Y.S.3d 884, and the Court of Appeals denied leave to appeal, *see Upson II*, 164 N.E.3d 958.  The Court accordingly must "accord the state courts' holdings 'substantial deference.'"  *Driver v. Coveny*, --- F. Supp. 3d ---, 2023 WL 4066558 (E.D.N.Y. 2023) (citing *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015)).

For the reasons set forth below, the Court denies Petitioner's habeas petition in its entirety.

## I.    Ground One: Social Media Evidence Was Erroneously Admitted

Petitioner argues that unauthenticated social media posts were erroneously admitted during trial, and that "their admission denied [Petitioner] his due process right to a fair trial."  (Dkt. 2, at 3.)  The inadmissible evidence included Facebook and Instagram posts—that the prosecution argued were posted by Petitioner—and indicated that Petitioner wanted to shoot Mallory "in the head for 'ratting him out.'"  (*Id.* at 2–3.)

"The erroneous admission of evidence constitutes a denial of due process only if the evidence in question was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed in the record without it."  *Guerrero*, 2023 WL 1070459,

11

at *4 (citation and quotation marks omitted); *see id.* ("[P]urported evidentiary errors are rarely a basis for [federal] habeas relief."). Moreover, "[w]hen a federal court reviews a state court determination that an error was harmless, the federal court 'may not award habeas relief under § 2254 unless the *harmlessness determination itself* was unreasonable.'" *Id.* (quoting *Fry v. Piller*, 551 U.S. 112, 119 (2007)). Here, the Appellative Division agreed with Petitioner that the social media posts were erroneously admitted, but found that "the admission of such evidence was harmless" because "the evidence of [Petitioner's] guilt was overwhelming, and there was no significant probability that the error contributed to [Petitioner's] convictions." *See Upson I*, 127 N.Y.S.3d at 885. Although the Appellate Division does not state what evidence it specifically found to be "overwhelming," this Court agrees that the prosecutor presented other admissible evidence that was sufficient for a reasonable jury to convict Petitioner, including Bowers's eyewitness testimony, the security camera tape from 32 Auburn Place, and Petitioner's recorded Rikers phone call. (Dkt. 5-3, at 25.) Accordingly, in light of the other admissible evidence presented against Petitioner at trial, the Court finds the Appellate Division's harmlessness determination is reasonable.

Thus, Petitioner's claim regarding the erroneous admission of evidence does not warrant federal habeas relief.

## II.    Ground Two: Prosecutor Improperly Impeached His Own Witness

Petitioner's second claim alleges that the court denied him a fair trial by allowing the prosecution to impeach Willis's testimony, even though the testimony did not affirmatively damage the prosecution's case. (Dkt. 2, at 8–9.) Petitioner concedes that this claim "was not properly preserved." (*Id.* at 12.) A federal court "may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 582 U.S. 521, 527 (2017).

12

Therefore, Petitioner's claim regarding Willis's impeachment is procedurally barred from this Court's review.  *See Downs*, 657 F.3d at 104 (explaining that New York's contemporaneous objection rule is "a firmly established and regularly followed New York procedural rule" that "constitutes an independent and adequate state law ground").

Even if Petitioner's claim was not barred, the Court agrees with the Appellate Division's substantive conclusion that "any error [from Willis's impeachment] was harmless[.]"  *Upson I*, 127 N.Y.S.3d at 885.  Indeed, upon admitting Willis's prior inconsistent statement, the trial court correctly provided a limiting instruction to the jury explaining that Willis's previous statements to the police could only be considered for the limited purpose of impeaching Willis's current testimony.  (Tr. 305 ("THE COURT: . . . Members of [the] jury, you just heard this witness'[s] testimony in court and you also heard evidence of [Petitioner's] prior statement made to [the] police, which is seemingly contradictory.  The prior[, contradictory] statement, what he told the police earlier, was allowed and was admitted for the limited purpose of impeaching this witness'[s] testimony at trial because his position disproves the position of the party that called the witness.").)  Moreover, contrary to Petitioner's allegation that the trial court "failed to define impeachment or explain how the jury was permitted to use the evidence" (Dkt. 2, at 11), the court included the exact model jury instructions Petitioner claims were omitted.  (*See* Tr. 680–81 (charging the jury and explaining that "[t]he contents of a prior inconsistent statement are not proof of what happened.  You may use evidence of a prior inconsistent statement only to evaluate the truthfulness or accuracy of the witness's testimony here at trial"); *id.* (explaining specifically that Willis's "prior inconsistent recorded statement . . . was allowed purely and only to impeach [his] testimony here at trial").)  Thus, the Court agrees with the Appellate Division's conclusion that any error from impeaching Willis was harmless.  *See Gonzales-Martinez v. Kirkpatrick*, No. 16-CV-5519 (JFB),

2017 WL 3891649, at *11 (E.D.N.Y. Sept. 6, 2017) (noting that a "limiting instruction lessens the potential prejudice" of the admitted evidence "because it sufficiently clarifies the limited purpose for which the jury could consider" the evidence).

Alternatively, Petitioner asks "the Court [to] find defense counsel ineffective for failing to object on the record" regarding Willis's impeachment.  (Dkt. 2, at 12.)  Counsel is ineffective when two criteria are met: (1) counsel's "efforts fall 'below an objective standard of reasonableness[;]'" and (2) "the attorney's errors resulted in prejudice to the defendant."  *Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010) (internal quotation marks omitted) (ultimately quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)).  To satisfy the prejudice prong, a petitioner must "prov[e] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* (citations and quotation marks omitted).  Here, Petitioner's counsel acted reasonably in choosing not to object to Willis's impeachment because New York law permits the prosecution to impeach its own witness, "[w]hen[,] upon examination by the party who called him, a witness in a criminal proceeding gives testimony upon a material issue of the case which tends to disprove the position of such party[.]"  N.Y. Crim. Proc. Law § 60.35(1); *see also People v. Berry*, 49 N.E.3d 703, 708 (N.Y. Mar. 29, 2016) (finding prosecution's impeachment of own witness was proper because parts of witness's testimony "were contrary to what he had told [the] police two years earlier and 'affirmatively damaged' the People's case").

Willis testified on direct examination that he fabricated his previous statements to the police regarding Petitioner's guilt (Tr. 310), which affirmatively weakened the prosecution's case. For example, Willis recanted his previous testimony stating that he heard his friend Johnson ask

Petitioner, "[w]hen are you going to do something about [Mallory]?", and Petitioner allegedly replying, "I'll shoot him.  I'll kill him."  (Tr. 304.)  Willis also recanted on his statement to the police about having seen Petitioner shoot Mallory.  (Tr. 317.)  Such testimony damaged the prosecution's theory regarding Petitioner's motive to kill Mallory and weakened the evidence they had of Petitioner as the murderer.  Accordingly, the trial court properly allowed the prosecution to impeach Willis.

Therefore, the decision by Petitioner's counsel not to object was reasonable, and the lack of objection did not affect the outcome of the trial because, as explained above, such an objection would have been futile and the prejudicial value of Willis's impeachment evidence was properly limited by the trial court's jury instructions.  Thus, Petitioner's ineffective assistance of counsel claim here is meritless.

## III.    Ground Three: Prosecutorial Misconduct and Prejudicial Photo Evidence

Petitioner's third claim consists of two unrelated sub-claims.  First, Petitioner raises a "prosecutorial misconduct" claim, arguing that the prosecutor "spent substantial portions of his voir dire, opening statement, and summation" vouching for Bowers's credibility.  (Dkt. 2, at 13.)  Second, Petitioner claims the "court allowed the prosecutor to introduce [16] photographs of Mallory's corpse, which served no purpose apart from inflaming the jury's [sympathy]."  (*Id.*)  The Court addresses each sub-claim in turn.

### A.    Prosecutorial Misconduct

Petitioner argues that the prosecutor made comments improperly bolstering the prosecution's witness, Bowers, and therefore "injected" the prosecutor's own credibility into the

proceedings.  (*Id.* at 13–16.)   In support of this argument, Petitioner points to a number of statements made by the prosecutor during the trial including, among others:

- "Referring to Bowers as a 'young man' with 'no record,'" and assuring the jury that Bowers "'saw this murder,' 'saw [Petitioner] take the life of another human being,' 'saw [the shooter] clearly,' and 'told the police exactly what he'd seen[.]'"  (Dkt. 5-2, at 37 (citing Voir Dire Tr. 143, 246, 265; Tr. 31, 33, 644, 648, 670).)

- Telling jurors that Bowers "'came in and told you the truth[.]'"  (*Id.* (citing Tr. 648).)

- Allegedly uncorroborated statements about the medical gunshot evidence and that when "'you get shot, you spin and you twist. . ..'"  (*Id.* at 38 (citing Tr. 655).)

- Repeatedly claiming that Bowers had "'valid reason to be afraid'" but came forward anyway.  (*Id.* at 39 (citing Voir Dire Tr. 249; Tr. 224–25, 264, 269, 644, 645, 669).)

- Stating that there was "'nothing but a ton of evidence that [Bowers] knew [Petitioner][.]'"  (*Id.* (citing Tr. 649.)

- Concluding that "'[w]e have proven our case beyond a reasonable doubt, and now it's your job[.]'"  (*Id.* at 37 (citing Tr. 670).)

Petitioner argues that by "vouching" for Bowers's credibility and "fram[ing] the verdict as a referendum on Bowers's character[,]" the prosecutor improperly shifted the burden of proof and deprived Petitioner of due process.  (Dkt. 2, at 15–16.)  For the reasons discussed below, this claim fails both procedurally and substantively.

First, Petitioner concedes that "defense counsel failed to preserve this issue by objecting to the prosecutor's improper remarks[.]"  (*Id.* at 16.)  Therefore, his prosecutorial misconduct claim is barred by the contemporaneous objection rule.  *See Downs*, 657 F.3d at 104 (explaining that New York's contemporaneous objection rule is "a firmly established and regularly followed New York procedural rule" that "constitutes an independent and adequate state law ground" precluding federal *habeas* review).

16

Furthermore, to the extent Petitioner's counsel preserved some remarks for appellate review, he has not shown that the prosecutor's comments violated his federal constitutional rights or that the Appellate Division's merits holding was unreasonable.  *See Upson I*, 127 N.Y.S.3d at 885 (holding that "the challenged remarks were either fair comment on the evidence and the reasonable inferences to be drawn therefrom, fair response to defense counsel's summation, or otherwise not improper").  "A criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding. . . . [To] reach the level of a constitutional violation, a prosecutor's remarks must 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991).  "The habeas court must consider the record as a whole when making this [due process] determination, because even a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context."  *Jackson*, 763 F.3d at 146 (citing *United States v. Young*, 470 U.S. 1, 16–17 (1985)).  Importantly, "'what might superficially appear to be improper vouching for witness credibility may turn out on closer examination to be permissible reference to the evidence in the case.'"  *Driver*, 2023 WL 4066558, at *11 (quoting *United States v. Williams*, 690 F.3d 70, 76 (2d Cir. 2012)).

The Court agrees with the Appellate Division that the prosecutor's comments about Bowers were entirely permissible references to, and fair comment on, the evidence in the case. *See Upson I*, 127 N.Y.S.3d at 885 (holding that "the challenged remarks were either fair comment on the evidence and the reasonable inferences to be drawn therefrom").  For example, the prosecutor's use of evidence about Bowers—including referencing his age, his lack of record, his long-standing acquaintance with Petitioner—were all appropriate invocations of evidence to

support Bowers's credibility.  *See Driver*, 2023 WL 4066558, at *10 (finding that prosecutor did

not improperly vouch for witnesses when stating that one had "no motive to lie" and that another's

personal interest in the case made it more likely her lineup identification was correct); *see also*

*Everett v. Fischer*, No. 00-CV-6300 (NG), 2002 WL 1447487, at *3 (E.D.N.Y. July 3, 2002)

("[F]or a prosecutor to assert in closing argument that witnesses had no reason to lie is perfectly

reasonable.  Such arguments do not shift the burden of proof to the defendant." (alterations

adopted) (citation and internal quotation marks omitted)).

     Moreover, even assuming *arguendo* that some of the prosecutor's statements were

improper—*and* the Court was not procedurally barred from reviewing them—the Court has

considered the record as a whole and does not find that any of the prosecutor's statements were so

egregious as to "undermine the fairness of the proceedings[.]"  *Jackson*, 763 F.3d at 146.  *See also*

*Donnelly v. DeChristoforo*, 416 U.S. 637, 647–48 (1974) (distinguishing between "ordinary trial

error of a prosecutor" and the type of "egregious misconduct . . . [that] amount[s] to a denial of

constitutional due process").  Thus, the Court finds that the Appellate Division's denial of

Petitioner's prosecutorial misconduct claim neither unreasonably applies clearly established

Supreme Court precedent, nor is an unreasonable determination of the facts.

     Lastly, to the extent Petitioner argues that his counsel was constitutionally ineffective for

failing to object to the prosecutor's statements, he has not established that counsel's performance

"fell below an objective standard of reasonableness" or that the failure to object prejudiced him.

*Strickland*, 466 U.S. at 688.  In fact, Petitioner raises this claim in a single conclusory sentence in

both the instant Petition and his Appellate Division brief.  (*See* Dkt. 2, at 16 ("Alternatively, this

Court should find that defense counsel was ineffective in failing to register a proper objection.");

App. Div. Br., Dkt. 5-2, at 41 ("Alternatively, this Court should find that defense counsel was

ineffective in failing to register a proper objection.").) *See also Driver*, 2023 WL 4066558, at *11 (rejecting the petitioner's ineffective assistance of counsel claim because it was asserted "in a single, conclusory phrase").

In sum, Petitioner's prosecutorial misconduct claim based on the prosecutor's remarks is barred by the contemporaneous objection rule and is meritless. Furthermore, Petitioner's ineffective assistance of counsel claim fails again here.

### B.    Unfairly Prejudicial Photo Evidence

Petitioner's second sub-claim argues that "[t]he trial court . . . violated clearly established [f]ederal [l]aw when it admitted 16 graphic photographs of the decedent['s] body that served no purpose apart from inflaming the jury's sympathy." (Dkt. 2, at 22.) First, the Court agrees with the Appellate Division's conclusion that the photographs "served to illustrate and corroborate witness testimony as to the [Petitioner's] proximity to the victim at the time of the shooting, and the number of shots fired." *Upson I*, 127 N.Y.S.3d at 885. The Court also agrees that the photographs were relevant because "the manner of death and intent were material issues in the case[.]" *Id.* Moreover, "[t]he Second Circuit has affirmed the admission of graphic photos" and lets "the trial court exercise[] discretion in weighing the probative and prejudicial effects" of such evidence. *United States v. Fell*, No. 01-CR-12-01, 2018 WL 7247414, at *1 (D. Vt. Apr. 4, 2018) (citing *United States v. Velazquez*, 246 F.3d 204, 210–11 (2d Cir. 2001)). Thus, the Appellate Division's decision regarding the graphic photographs was reasonable and the photographs' admission did not violate clearly established federal law.

***

Accordingly, the Court denies Petitioner's third claim for habeas relief in its entirety and finds no ineffective assistance by Petitioner's trial counsel for failing to object to the alleged prosecutorial misconduct.

## IV.     Ground Four: Excessive Sentence

Federal courts only have the authority to consider a "federal constitutional issue" when reviewing Petitioner's sentence, and "'[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law[.]'"  *Driver*, 2023 WL 4066558, at *13 (quoting *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)); *see also Herrera v. Artuz*, 171 F. Supp. 2d 146, 151 (S.D.N.Y. 2001) ("It is well settled that when a sentence is in accord with the range established by state statutory law there is no constitutional issue presented for habeas review."); *Chelley v. New York*, 475 F. Supp. 3d 168, 177–78 (W.D.N.Y. 2020) ("'Although "New York's Appellate Division has discretion to reduce a sentence in the interest of justice, a federal habeas court considering a state-court conviction has no such power, and a claim that a sentence should be reduced in the interest of justice does not allege a violation of a federally protected right."'" (ultimately quoting *Baide-Ferrero v. Ercole*, No. 06-CV-6961 (RJS), 2010 WL 1257615, at *4 (S.D.N.Y. Mar. 31, 2010))).

Here, Petitioner's sentence of 22 years to life is below the maximum allowed by New York law for his convicted crimes.  (*See* Dkt. 5, at 15 (explaining that maximum lawful prison term for second-degree murder is twenty-five years to life under N.Y. Penal Law §§ 70.00(2), (3), and 125.25(3)); Dkt. 5-3, at 63–64.)  Thus, no federal constitutional issue is presented.  *See Herrera*, 171 F. Supp. 2d at 151.  Petitioner asks the Court to reduce his "sentence to the minimum term of 15 years to life" "in the interest of justice."  (Dkt. 2, at 19–20.)  Petitioner explains that he was "a promising young man" "[n]ot long before th[e] incident," and that "challenging personal circumstances[,]" including his single mother's stroke and her extended hospitalization early on in high school, led to his "downward spiral" that resulted in dropping out of school and, ultimately, homelessness.  (*Id.*)  Although the Court recognizes that Petitioner suffered from adverse

circumstances throughout his childhood, this Court can only review Petitioner's sentence for federal constitutional issues.

Accordingly, the Court denies Petitioner's excessive sentence claim because it does not raise a constitutional issue.

## CONCLUSION

Petitioner has failed to show any basis for relief under 28 U.S.C. § 2254. Accordingly, his habeas petition is denied in its entirety. Moreover, the Court declines to issue a certificate of appealability because Petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). The Clerk of Court is respectfully directed to enter judgment accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: August 29, 2023
Brooklyn, New York